**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| C&M PROPERTY MANAGEMENT, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Docket no. 2:15-cv-336-GZS |
| v. | ) |
| | ) |
| MOARK, LLC d/b/a MOARK MAINE, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Before the Court is Defendant's Motion for Partial Summary Judgment (ECF No. 42). As explained herein, the Court GRANTS IN PART AND DENIES IN PART the Motion. Specifically, the Court GRANTS the Motion as to the scope of damages, GRANTS IN PART and DENIES IN PART the Motion as to Plaintiff's defamation claim, and DENIES the Motion as to Plaintiff's negligence claim.

## I.    LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is

one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (internal quotation marks and punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993).

## II.      FACTUAL BACKGROUND

In 2006, Plaintiff C&M Property Management, LLC ("C&M"), a Connecticut limited liability company whose sole member and principal is Michael Warbin, began performing pest-control services for commercial egg-laying facilities that were subsequently acquired by Defendant Moark, LLC ("Moark").[1]  Moark is a Missouri limited liability company whose members include Land O'Lakes, Inc. ("Land O'Lakes"), a Minnesota corporation with its principal place of business in that state.  At the time C&M began servicing the facilities, John Howard was employed as a production manager for the facility in Bozrah, Connecticut.  Howard was aware that Warbin used a .22 caliber rifle at the facility in Bozrah to shoot pests.  Howard also did some shooting of pests at that facility.

At the end of a trial period for C&M's services in 2006, Warbin and his ex-wife, who was involved with C&M's operations at the time, met with Blair "Skip" Hagy to discuss the continuation of C&M's pest control services.  Hagy would later become the General Manager of Moark's Eastern Division, which eventually included Connecticut and Maine.  As General Manager, Hagy was ultimately responsible for all safety issues at Moark's facilities in the division.  Warbin alleges that he told Hagy at the meeting that C&M would like to implement safety protocols regarding the use of firearms, including the notification of Moark employees that C&M was using firearms and the hanging of signs to that effect.  Warbin further alleges that Hagy indicated in response that he did not wish to create any official or written safety protocols because he did not want people outside of Moark to know that C&M was using firearms at Moark's

---

[1]  C&M initially entered into a services agreement with Kofkoff Egg Farms, LLC, which was later acquired by Moark, and the record is unclear as to when exactly Moark took over management of the facilities.  The Court does not recite the facts concerning the agreement between C&M and Kofkoff/Moark because the agreement is no longer relevant to deciding Defendant's Motion in light of Plaintiff's concession regarding damages for breach of contract.  See infra at 8 and n.14.

3

facilities.  No written safety procedures or policies were ever created for C&M's use of firearms at Moark's facilities.

In 2011, C&M began servicing Moark's facility in Turner, Maine (hereinafter, "the facility").  Gwen (then Ken) Gruver was Plant Manager at the facility.  Moark maintained a no-firearms policy at the facility but allowed Warbin to use a .22 caliber rifle to shoot pests as an exception to that policy.[2]  According to Moark's production manager in Maine, it was common knowledge at Moark that Warbin would routinely use a gun to shoot rats and other pests as part of C&M's services.  From at least May 2012 through the date of the fatal shooting at the center of this case, Moark received several invoices from C&M that included charges for ammunition.

When shooting rodents, Warbin would use *pellet shot*.  Pellet shot is not usually lethal to humans.  (See 10/05/16 Warbin Dep., Ex. A to Def.'s Statement of Material Facts (ECF No. 43-2), Page ID # 298.)  When shooting stray chickens, however, he would use *.22 caliber bullets*. Warbin may have only shot chickens during the day when employees were present at the facility on one other occasion prior to the fatal shooting.  (See 10/05/16 Warbin Dep., Ex. A1 to Def.'s Statement of Material Facts (ECF No. 43-3), Page ID # 310; 10/05/16 Warbin Dep., Ex. A2 to Def.'s Statement of Material Facts (ECF No. 43-4), Page ID # 332.)  Warbin would notify a Moark employee and/or a manager before doing any shooting.[3]

---

[2] Although the policy prohibits "the use or possession of firearms and other weapons . . . on Company premises," the policy falls under the heading of "Firearms in the Workplace" in the Moark employee handbook and the parties routinely refer to it as the "no-firearms policy."  (See Moark Employee Handbook, Ex. R. to Def.'s Statement of Material Facts (ECF No. 43-23), Page ID # 637.)

[3] Warbin's deposition testimony is unclear on the point of whether he would routinely let a manager know, an employee know, or both.  (See 10/05/16 Warbin Dep., Ex. A to Def.'s Statement of Material Facts (ECF No. 43-2), Page ID # 304) ("Q: [I]f C&M was going to use a rifle at the Turner facility during the daytime when employees were around, you would talk to a manager first, right? A: I would talk to a Moark employee, not just a manager.")  Warbin does clearly state that "[s]omeone at the facility always knows before I go in shooting."  (Id., Page ID # 303.)

On August 19, 2013, Warbin went to the facility for the purpose of spraying weeds around the egg-laying barns with herbicide as part of C&M's services. While he was spraying weeds, Warbin encountered Kempton MacDougall, a Moark employee involved with pest control. MacDougall informed Warbin that he was on his way to an egg-laying barn, Barn 51, to remove stray chickens left behind in the barn after the barn was emptied.[4] Warbin offered to assist MacDougall by shooting any stray chickens. It was mid-afternoon and more than two hundred employees were working at the facility at that time, but MacDougall informed Warbin that Barn 51 was shut down for the day. Other than MacDougall, no Moark employee was aware that Warbin would be using his rifle in Barn 51. After retrieving his rifle from his truck and loading it with .22 caliber bullets, Warbin walked with MacDougall through the barn to make sure that nobody was inside and then began shooting.[5] Unbeknownst to Warbin, Moark management had separately instructed an employee, Manuel Adame, to gather stray chickens in Barn 51 and euthanize them by wringing their necks.

Sometime after Warbin shot the chickens, Maine State Police were called to the facility due to the discovery of a bleeding and unresponsive man, who turned out to be Adame.[6] Officer Eric Paquette questioned several employees about what could have happened and asked Hagy and Gruver about the possibility of a shooting in Barn 51.[7] Hagy responded that Moark maintained a

---

[4] For context, Barn 51 is approximately 550 feet long, or almost the length of two football fields, contains rows of cages with aisles between them, and has multiple entrances. On the day of the shooting, one row of lights was out. Due to the length of the barn and the lighting, it would be difficult to see from one end of the barn to the other with plain eyesight. With the large fans used to ventilate the barn turned on, it would also be difficult to hear a person on the other side of the barn or the report of a rifle.

[5] At some point, Warbin left the barn to reload before returning and resuming shooting.

[6] Adame died in the ambulance at the scene. The medical examiner later determined that he bled to death due to a bullet severing substantial arteries.

[7] Sometime after arriving on the scene, police investigators followed a trail of blood from where Adame had been found to Barn 51. While placing police tape on one of the doors to Barn 51, Officer Paquette observed a fired .22 caliber bullet and found numerous spent casings on the floor of the barn. It was after these observations that Officer

no-firearms policy (of which Officer Paquette had long been aware), but that Warbin could have been shooting rats with a pellet gun. Specifically, the summary of the police interview with Hagy records the following:[8]

> Mike Warbin kills rodents and chickens on the farm. Hagy didn't know if Warbin was scheduled to kill any chickens or rodents today. It surprises Hagy that Warbin was using live ammunition. Hagy thought Warbin used a pellet gun but didn't know.

(Ex. M to Def.'s Statement of Material Facts (ECF No. 43-18), Page ID # 626.) The summary of the subsequent police interview with Gruver records the following:

> Warbin usually kills the mice with chemicals. Warbin has a method of looking for the mice. If there are less than 10 mice in the coop at one time, they can reopen the empty coop. Gruver did not know Warbin was there today to exterminate mice. Gruver thought Warbin used a pellet gun. He didn't know Warbin used a gun with live ammo.

(Ex. N to Def.'s Statement of Material Facts (ECF No. 43-19), Page ID # 628.)

Gruver then called Warbin on his cell phone to ask him if he had been shooting a rifle in Barn 51, and Warbin informed Gruver that he had been shooting stray chickens with a rifle. In addition to interviewing Hagy, Gruver, and Warbin,[9] the police interviewed Production Manager Allen Fletcher, who stated that Warbin would shoot pests in the barns, but that as a rule he would let Moark managers know that he was going to be shooting.[10]

---

Paquette raised the possibility of a shooting to Hagy and Gruver. The police investigation found dead chickens gathered at the end of the barn where the blood trail originated, suggesting that Adame had been gathering chickens there when he was shot.

[8] The Court understands from the context of this summary and the Gruver summary below, as well as from the parties' filings, that they are summaries of interviews on the day of the shooting even though they are dated August 20.

[9] Warbin was still at the facility when the police arrived to investigate and spoke with the police both before and after the police conversations with Hagy and Gruver.

[10] The Court does not consider Hagy's acknowledgement at his deposition of certain documents that are not in the summary judgment record to constitute admissions about interactions among Moark, representatives of the Maine state veterinarian's office, New England Genetics, and the state police. (See Pl.'s Statement of Add'l Material Facts (ECF. No. 47), Page ID #s 666-67.) Regardless, consideration of these interactions would only strengthen the Court's determination that there are genuine issues of material fact regarding Plaintiff's defamation and negligence claims.

At some point after the shooting, Land O'Lakes circulated an internal company statement entitled "Update on Moark Employee Death." The statement included the following paragraph:

> Employee safety is our number one value; we are saddened by this loss and are committed to better understanding what happened. *Tragic events like this remind us how important it is for each of us to be extremely focused on personal safety and to speak up [i]f we see unsafe activities taking place*.

(Ex. P to Def.'s Statement of Material Facts (ECF No. 43-21), Page ID # 631) (emphasis added).

On August 20, 2013, the day after the fatal shooting, Moark informed C&M that it was immediately and completely terminating its business relationship with the company and that C&M was no longer permitted to set foot on any Moark property.

Warbin was eventually charged in state court with Class A manslaughter for Adame's death.[11] On October 14, 2014, Warbin pleaded no contest to the criminal charges. During the plea hearing, the prosecutor outlined the facts establishing the crime and stated the following:

> Apparently in the past, it was not unusual for Mr. Warbin to use a .22 rifle loaded with pellet shot to shoot rodents in the barn that remained after the baiting process. And when this was done, he would give notice to Moark supervisors and so forth to make sure that everyone knew about it. But in this particular instance, Mr. Warbin offered to assist [MacDougall] [to] get rid of the loose chickens by shooting them with a semi-automatic .22 loaded with .22 Long ammunition. No notice was given to the authorities and no permission was sought to do this.

(Ex. G to Def.'s Statement of Material Facts (ECF No. 43-12), Page ID #s 592-93.) Warbin accepted the prosecutor's statement of the facts without any corrections.[12] C&M commenced the present lawsuit on August 19, 2015, asserting claims against Moark for breach of contract, defamation, and negligence.[13]

---

[11] A wrongful death suit was filed against C&M and Warbin in federal court and settled before trial. See Angelina Ortiz Hernandez v. C&M Property Management LLC & Michael E. Warbin, 2:14-cv-00389-JAW.

[12] Warbin was sentenced, in part, to three years of incarceration, with all but forty-five days suspended, four years of probation, and five hundred hours of public service.

[13] The case was initially filed by C&M and Warbin. On March 31, 2016, this Court dismissed Warbin as a plaintiff. (ECF No. 15.)

## III.    DISCUSSION

Plaintiff's First Amended Complaint (ECF No. 10) contains three counts, Breach of Contract (Count I), Defamation/Defamation Per Se (Count II), and Negligence (Count III).  With the scope of damages issue conceded by Plaintiff,[14] the Court considers Defendant's Motion for Partial Summary Judgment as to Plaintiff's defamation and negligence claims.

### A.  Plaintiff's Defamation Claim

Plaintiff claims it was defamed by (1) Hagy and Gruver's statements to the police suggesting that they were unaware of the nature of Plaintiff's shooting activities and/or suggesting that Plaintiff had violated the no-firearms policy at the Turner facility; and (2) the statement by Land O'Lakes suggesting that Adame's death was the result of "unsafe activities."[15]

The elements of a defamation claim under Maine law are:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.[16]

---

[14] Defendant moved to dismiss "Plaintiff's claim for damages for breach of contract in excess of the net profits that Plaintiff would have earned during the thirty-day notice period for termination of the contract at issue in this case." (Def.'s Mot. for Partial Summ. J. (ECF No. 42), Page ID # 257.)  In its Response, Plaintiff "concedes that Moark's position with respect to its damages for breach of contract is correct as a matter of law" and implies that it will not be seeking damages for breach of contract in excess of the potential net profits for the thirty-day notice period.  (Pl.'s Resp. (ECF No. 46), Page ID # 648.)

[15] Plaintiff admits there is no evidence that anyone from Moark ever *explicitly told* anyone else that C&M had violated the no-firearms policy.  (See Pl.'s Opp'n to Def.'s Statement of Material Facts (ECF No. 47), Page ID # 657.)  However, Plaintiff essentially alleges it was defamed by statements *implying* that Moark was unaware that C&M was using firearms at the Turner facility and thus that C&M was in violation of the policy.  (See Pl.'s Resp., Page ID # 646.)  As explained below, the Court determines that these statements may indeed be actionable.  The Court understands that Plaintiff now bases its defamation claim solely upon the identified statements by Hagy and Gruver to the police and the Land O'Lakes statement.  (See id., Page ID #s 646-47.)

[16] "False statements are defamatory *per se* if they relate to a profession, occupation, or official station in which the plaintiff was employed.  In such cases, malice is implied as a matter of law, and a plaintiff may recover a compensatory

8

<u>Lester v. Powers</u>, 596 A.2d 65, 69 (Me. 1991) (quoting *Restatement (Second) of Torts* § 558 (1977)).  In general, "[a] defamation claim requires a statement-i.e. an assertion of fact, *either explicit or implied*, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts."  <u>Id.</u> (emphasis added).  Whether explicit or implied, a false assertion of fact is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  <u>Schoff v. York Cty.</u>, 761 A.2d 869, 871 n.3 (Me. 2000) (quotation marks omitted).[17]  Whether a statement conveys a defamatory message is a question of law.  <u>Bakal v. Weare</u>, 583 A.2d 1028, 1030 (Me. 1990).  A court must determine whether the statement is defamatory in the understanding of those to whom it was addressed, <u>Pan Am Sys., Inc. v. Atl. Ne. Rails and Ports, Inc.</u>, 804 F.3d 59, 64 (1st Cir. 2015), and must consider the statement's "context, which includes the entire publication and all extrinsic circumstances known to the recipient," <u>Schoff</u>, 761 A.2d at 871 n.3.  However, "if the court concludes that the statement can reasonably carry both a defamatory and nondefamatory meaning, it is up to a jury to decide whether the statement was in fact understood as defamatory by its recipients." <u>Pan Am Sys., Inc.</u>, 804 F.3d at 64.

The Court concludes that the statements by Hagy and Gruver to the police present triable issues of fact and are not susceptible to disposition as a matter of law.  As to falsity, the record

---

award without proving special damages."  <u>Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 504 F.3d 189, 198 (1st Cir. 2007) (citations omitted).

[17] Plaintiff cites precedent suggesting that a defamatory statement is "no less defamatory because it accomplishes its damaging mission by the use of insinuation."  <u>Cross v. Guy Gannett Publ'g Co.</u>, 121 A.2d 355, 357 (Me. 1956).  On the other hand, however, there is precedent counseling that, in determining whether a statement is defamatory, the court must construe the statement "stripped of innuendo, insinuation, colloquium, and explanatory circumstances." <u>Picard v. Brennan</u>, 307 A.2d 833, 835 (Me. 1973) (quotation marks omitted).  It is clear, however, that a court may consider "implied" assertions of fact, <u>Lester</u>, 596 A.2d at 69, and thus the Court need not, and does not, delve into the precise meaning of "insinuation" in the context of defamation under Maine law.

presents a genuine issue of material fact as to whether the statements falsely implied that C&M used a .22 rifle at the Turner facility without the knowledge of Moark management and violated the facility's no-firearms policy.  On this record, a reasonable factfinder could determine that Hagy and Gruver were actually aware of the fact that Warbin used a .22 rifle, and not a pellet gun, to shoot pests or chickens, despite their statements to the contrary, and that he was authorized to do so.  As to defamatory meaning, the implication either that C&M violated the facility's policy or acted without the authorization of its employer can reasonably carry a defamatory meaning.  In particular, both Hagy and Gruver said they believed that Warbin only used a pellet gun, which is contradicted by Defendant's admission that Warbin was authorized by Moark to use a .22 caliber rifle.  The Court notes Officer Paquette's deposition testimony in the wrongful death suit that he does not consider a pellet gun to be a "firearm."  (Ex. D to Def.'s Statement of Material Facts (ECF No. 43-9), Page ID # 557.)  Indeed, Maine law excludes pellet guns from the definition of "firearm" in the criminal code.  See 17-A M.R.S.A. § 2(12-A); see also State v. Rice, 930 A.2d 1064, 1071 (Me. 2007) (dissenting opinion) ("The statutory definition of a 'firearm' does not include toy guns, or paintball or pellet guns (which expel paint or metal pellets by use of compressed air).").  A reasonable factfinder could conclude that the police would have understood Hagy and Gruver's statements regarding Warbin's use of a pellet gun to imply that C&M had not been granted an exception to the "no-firearms" policy.[18]

Defendant's arguments to the contrary are unconvincing.  For example, Defendant contends that the statements by Hagy and Gruver cannot be defamatory because they "were

---

[18] The Court notes that the record is not always entirely clear as to whether a given person knew that Warbin used a .22 rifle versus a pellet gun and whether those who knew he used a rifle believed that he used *pellet shot* rather than *bullets*.  However, for purposes of deciding this Motion, the key undisputed fact is that Hagy and Gruver told the police they believed that Warbin used a pellet gun rather than a rifle or some other type of firearm.

unaware that Mr. Warbin had been using a firearm" on the day of the shooting at the time they made their statements to the police.  (Def.'s Mot. for Partial Summ. J. (ECF No. 42), Page ID # 264.)  But it could be reasonable to conclude that once Hagy and Gruver were aware that the police suspected a shooting they made statements intended to cast ultimate responsibility for the tragedy upon C&M.  Furthermore, it would be reasonable for the police to conclude based on the statements by Moark's regional manager and the facility's plant manager that C&M had not been authorized to use a firearm or had concealed its use of firearms from Moark management.[19]

In contrast, the Court concludes that the Land O'Lakes statement does not support the defamation claim.  Plaintiff contends that the statement is defamatory because it suggests that "unsafe activities" on C&M's part lead to Adame's death.  (Pl.'s Resp. (ECF No. 46), Page ID # 647.)  Putting aside the contested issue of whether or not Moark may be held liable for a statement attributed to Land O'Lakes, and assuming that the statement is "of and concerning" C&M, see Lynch v. Christie, No. 2:11-CV-70-DBH, 2012 WL 5874841, at *3 (D. Me. Nov. 20, 2012), the implication that C&M's shooting activity was "unsafe" is an opinion that is not provable as false, see e.g., Witter v. Delta Airlines, Inc., 966 F. Supp. 1193, 1202 (N.D. Ga. 1997) (statement that plaintiff's behavior created an "unsafe condition" is an opinion rather than a disprovable statement of fact).  Opinions that are not provable as false cannot support a defamation claim.  See Levesque v. Doocy, 560 F.3d 82, 88 (D. Me. 2009) ("A communication is defamatory if it is provable as false . . . ."); Fortier v. Int'l Bhd. of Elec. Workers, Local 2327, 605 A.2d 79, 80 (Me. 1992) ("To be actionable the statement must contain a false statement of fact rather than an opinion . . . A

---

[19] Although statements to law enforcement may be conditionally privileged, the privilege does not apply if the person making the statement knows it to be false.  See Truman v. Browne, 788 A.2d 168, 172 (Me. 2001) ("Any person has a qualified privilege to make statements to law enforcement . . . where the person making the statement *believes in good faith that the statement is true* . . . .") (emphasis added).  In any case, Defendant does not argue that the statements to the police were privileged.

statement is not actionable if it is clear the maker did not intend to state an objective fact but rather to present an interpretation of the facts.")

For these reasons, the Court DENIES Defendant's Motion as to the statements by Hagy and Gruver, but GRANTS the Motion as to the Land O'Lakes statement.

### B.  Plaintiff's Negligence Claim

As the basis for its negligence claim, Plaintiff contends that Defendant failed in its "duty to C&M and to [Moark's] employees to exercise reasonable care to ensure that its facilities were safe for C&M's pest control efforts."[20]  (First Amend. Compl., ¶ 35.)  The record before the Court clearly presents triable issues of fact regarding this negligence theory.  To provide one of the clearest examples, there is a dispute about whether or not C&M discussed instituting firearms safety procedures with Moark management and was rebuffed.[21]

In its Motion, however, Defendant asserts that Plaintiff cannot establish the causation element of its negligence claim as a matter of law because Warbin has on occasion denied that he shot Adame and has suggested that he only pleaded no contest to the manslaughter charges because he was emotionally distressed.[22]  (See Def.'s Mot. for Partial Summ. J., Page ID # 270.)  The logic

---

[20] "A cause of action for negligence [under Maine law] has four elements: (1) a duty of care owed to the plaintiff; (2) a breach of that duty; (3) an injury; and (4) causation, that is, a finding that the breach of the duty of care was a cause of the injury."  Bell ex rel. Bell v. Dawson, 82 A.3d 827, 831-32 (Me. 2013) (quotation marks omitted).  Defendant does not appear to raise any issue concerning the existence of a duty of care and, therefore, the Court expresses no opinion on that issue.

[21] Hagy testified at his deposition to the effect that he does not remember discussing firearm safety at the meeting with C&M but would not be in a position to confirm or deny it if Warbin said they did discuss firearm safety. (Ex. C to Def.'s Statement of Material Facts (ECF No. 43-8), Page ID # 531.)  The Court does not consider this to be an admission.  Defendant denies that Warbin discussed firearms safety protocols with Hagy and notes that Hagy also testified that he would have remembered any conversation about firearms safety protocols if it had occurred.  (See Def.'s Resp. to Pl.'s Statement of Add'l Material Facts (ECF No. 48), Page ID #s 674-75.)

[22] The Court notes that causation is ordinarily a question of fact.  See Dyer v. Me. Drilling & Blasting, Inc., 984 A.2d 210, 219 (Me. 2009) ("The question of causation is generally one of fact to be determined by the fact-finder, and a judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause.") (internal quotation marks omitted).

is that if Warbin did not shoot Adame, then Moark did not breach a duty to prevent Warbin from shooting Adame. The Court is unconvinced. Although Warbin's statements expressing disbelief that he was responsible for Adame's death may provide fodder for the defense at trial, the Court does not believe that it should essentially estop C&M from pursuing its negligence theory on that basis. Indeed, C&M's position is consistent with the fact that Warbin pleaded no contest to the manslaughter charges in state court and did not contest the prosecutor's version of events.[23] See Guay v. Burack, 677 F.3d 10, 16 (1st Cir. 2012) ("The equitable doctrine of judicial estoppel is ordinarily applied to prevent[] a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding.") (internal quotation marks omitted); HL 1, LLC v. Riverwalk, LLC, 15 A.3d 725, 736 (Me. 2011) (discussing similar circumstances for application of judicial estoppel under Maine law; see also Berkowitz v. Berkowitz, 817 F.3d 809, 813 n.6 (1st Cir. 2016) (declining to decide whether federal or state law of judicial estoppel applies in diversity cases).

Finally, unlike in the Maine cases cited by Defendant, the inference of causation in this case "flows logically from the facts and is not unduly speculative." Estate of Smith v. Salvesen, 143 A.3d 780, 786 (Me. 2016). Simply put, it is not "pure speculation" that Warbin shot Adame, and the possibility that Warbin shot Adame and the possibility that Adame was shot by an unknown shooter are not "evenly balanced." See Warriner v. Wal-Mart Stores East, LP, 832 F. Supp. 2d 78, 85 (D. Me. 2011) ("[W]hen the matter remains one of pure speculation or conjecture, or even if the possibilities are evenly balanced, a defendant is entitled to a judgment.") (quotation marks omitted).

---

[23] The Court is not suggesting that the no contest plea has any preclusive effect in this civil suit but is merely noting that the Plaintiff's position in this suit regarding what caused Adame's death is *consistent* with Warbin's plea.

For these reasons, the Court DENIES Defendant's Motion as to Plaintiff's negligence claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion as to the scope of damages, GRANTS IN PART and DENIES IN PART the Motion as to Plaintiff's defamation claim, and DENIES the Motion as to Plaintiff's negligence claim.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 20th day of March, 2017.