UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| C&M PROPERTY MANAGEMENT, LLC, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff | ) |  |
| v. | ) | No. 2:15-cv-00336-JHR |
|  | ) |  |
| MOARK, LLC, | ) |  |
|  | ) |  |
| Defendant | ) |  |

### MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S
### MOTION IN LIMINE TO EXCLUDE DEFENDANT'S EXPERT

Plaintiff C&M Property Management, LLC ("C&M") moves *in limine* to exclude the testimony of Donald Mailhot, the liability expert designated by defendant Moark, LLC ("Moark"), on the bases that the testimony merely addresses matters of common sense, rendering it superfluous, and does not fit the facts of the case. *See generally* Plaintiff's Motion *in Limine* To Exclude Defendant's Liability Expert Donald Mailhot ("Motion") (ECF No. 62). For the reasons that follow, I deny the Motion.

### I. Factual Background

C&M sues Moark for breach of contract, defamation, and negligence. *See* First Amended Complaint (ECF No. 10) ¶¶ 26-37. It alleges, in relevant part, that, pursuant to a written contract with Moark, it was responsible for pest control at Moark's egg farm facilities across the United States, including its facility in Turner, Maine; Moark knew and approved of C&M's use of firearms in performing its pest control duties; on August, 19, 2013, a Moark employee was shot and killed at the Turner facility while C&M was engaged in pest control services there; Moark knew or should have known that C&M was using firearms to remove pests that day; and, Moark failed to exercise reasonable care to ensure that all of its employees were removed from the area before C&M

1

conducted its pest control activities. *See id*. ¶¶ 11-18. As relevant to the Motion, C&M seeks damages for Moark's alleged negligence in breaching a duty to exercise reasonable care to ensure that its facilities were safe for C&M's pest control efforts. *See id*. ¶¶ 35-37.

Mailhot's expected testimony bears on Moark's affirmative defense that C&M's negligence claim is barred by C&M's own comparative negligence. *See* Affirmative Defenses, commencing on page 5 of Answer, Affirmative Defenses and Demand for Jury Trial (ECF No. 16), ¶ 10; Defendant's Memorandum of Law in Opposition to Plaintiff's Motion in Limine To Exclude Expert Testimony ("Opposition") (ECF No. 71) at 4.

In his expert report, a copy of which is appended to the Motion, Mailhot describes his area of expertise as occupational health and safety, construction safety and health, and firearm, range, and safety training. *See* Report of Donald R. Mailhot – OHST, included in ECF No. 62-1, at 1. He worked as a Lewiston, Maine, police officer for over 24 years, retiring in 2006 as a senior lieutenant. *See id*. He has been employed since then as the Safety Coordinator for the City of Lewiston. *See id*. He has dual Central Maine Community College certificates in Occupational Health and Safety and in Construction Safety and Health and is an Occupational Health and Safety Technologist, certified through the Bureau of Certified Safety Professionals. *See id*. He is a National Rifle Association ("NRA") Certified Range Safety Officer and instructor in the areas of home firearm safety, "Refuse to be a Victim," pistols, personal protection in the home, and personal protection outside of the home. *See id*. He is the owner-member of R.D. Tactical Handgun Instruction, LLC, and the chief firearm instructor for that company, teaching every level of firearm from beginner's pistols to tactical handguns, rifles, and shotguns. *See id*. He is familiar with Occupational Safety and Health Administration ("OSHA") general industry rules,

construction rules, and the NRA's firearm safety requirements as well as universal firearm safety requirements from a variety of different safety companies, organizations, and agencies. *See id*.

Mailhot summarizes salient facts of this case, as he understands them, as follows:

Moark formerly operated a large egg-laying facility in Turner, Maine, employing C&M to perform pest control services for that facility. *See id*. at 2. On August 19, 2013, Michael Warbin, the owner of C&M, was at the Turner facility to spray herbicide, with no plans to use firearms, when he ran into Moark employee Kempton McDougall, who told Warbin that he was on his way to remove stray chickens from Barn 51. *See id*. Warbin offered to assist McDougall by shooting the chickens, and McDougall accepted that offer. *See id*. Warbin, who had occasionally used a .22-caliber rifle loaded with pellet shot to shoot mice in the laying barns at the Turner facility, obtained a .22-caliber rifle from his car and loaded it with .22-caliber, long-rifle, sub-sonic, hollow-point bullets. *See id*. at 2-3. Accompanied by McDougall, he entered Barn 51 and began shooting stray chickens. *See id*. at 3. Warbin did not notify Moark management personnel or other employees that he was going into Barn 51 to shoot chickens. *See id*. Moark sent an employee named Manuel Adame to Barn 51 to assist McDougall in removing the chickens. *See id*. After entering Barn 51, Adame was shot and killed. *See id*.

Mailhot intends to offer the opinion that Warbin failed to exercise reasonable care, and was actually reckless, in his use of a firearm on the day that Adame was killed. *See id*. He cites a number of bases for this conclusion, including Warbin's failure to (i) conduct a Job Hazard Analysis, (ii) warn management or other employees by posting signs or barricades or, alternatively, secure the barn, given its length (550 feet), low lighting, and the noise of fans, making it difficult to detect someone entering, (iii) heed warnings on the package of ammunition, including a warning not to shoot at hard surfaces or water to prevent ricochet, (iv) follow certain rules for safe gun

3

handling published by the National Shooting Sports Foundation, Inc. ("NSSF"), the trade association for America's firearms industry, or (v) heed certain NRA safety rules. *See id*. at 3-8.

He concludes: "Mr. Warbin . . . failed to follow basic firearm safety rules and failed to make appropriate notifications that would have prevented this tragedy." *Id*. at 9. He states, among other things, that Warbin chose to use inappropriate ammunition due to the unknown backstops, and the ammunition's ability to travel long distances, ricochet, and cause serious injury, and should have chosen larger pellet rounds. *See id*. at 10.

## II. Discussion

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if[,]" *inter alia*, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[,]" and "the testimony is based on sufficient facts or data[.]" Fed. R. Evid. 702. C&M contends that the proposed Mailhot testimony is deficient in both respects. *See* Motion at 2-4.

### A. Common Knowledge

C&M notes that "[t]he central liability issue in this case is whether or not [Moark] caused the shooting death of its employee by failing to implement safety protocols as requested by [C&M]." *Id*. at 1. C&M first contends that, while Moark has designated Mailhot to provide expert testimony to rebut this claim by pointing to allegedly negligent actions by C&M, his anticipated testimony will serve no useful purpose because the jury is capable of assessing, as a matter of common sense, whether Warbin should have warned management, secured the barn, posted signs, or used different ammunition. *See id.* at 1-3. C&M argues, for example, that the anticipated testimony adds nothing to the jury's resolution of a factual dispute regarding whether or not C&M

4

was required to notify Moark *management* of anticipated firearm use, instead of a Moark *employee*. *See id*. at 2.

Nonetheless, as Moark counters, *see* Opposition at 1, the anticipated testimony will assist the jury in determining the applicable standard of care and whether C&M deviated from it. While certain gun safety rules may be a matter of common sense, that is not the case here, in which a firearm was used in a large commercial egg-laying facility as a means of pest control. Mailhot's testimony, as a workplace safety and firearm safety expert, on standards of care applicable in that situation – for example, the appropriate choice of firearm and ammunition and the need for employee safety warnings and/or other security given the conditions in the barn and other relevant factors – will assist the jury in determining the ultimate question of whether C&M, or for that matter Moark, was negligent on the day in question and, if the jury concludes that both were negligent, in apportioning their relative degree of negligence. *See* 14 M.R.S.A. § 156 (comparative negligence defense).

While Mailhot may not testify to legal conclusions, *e.g*., that C&M was "negligent," *see, e.g., Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.") (citation and internal quotation marks omitted), "[a]n opinion is not objectionable just because it embraces an ultimate issue[,]" Fed. R. Evid. 704. Mailhot may testify as to whether certain conduct comports with applicable industry standards, practices, and/or customs. *See, e.g., M.H. v. County of Alameda*, Case. No. 11-cv-02868-JST, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015) ("[T]he cases . . . consistently hold that while an expert cannot testify as to 'deliberate indifference' or 'objective reasonableness' using those specific terms, . . . they may opine as to the appropriate standards of healthcare in a correctional facility, or generally

5

accepted law enforcement standards, custom, or practice."); *Richman v. Sheahan*, 415 F. Supp.2d 929, 945 (N.D. Ill. 2006) ("There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards.").

### B. Insufficient Factual Basis

C&M next argues that Mailhot's expected testimony does not fit the facts of this case because it is undisputed that (i) Moark instructed C&M not to post warning signs or give any other visible indication of the use of firearms on the premises, and (ii) the victim was shot inside the barn after being sent there by two different Moark supervisors. *See* Motion at 2.

However, Moark does, in fact, dispute that it instructed C&M not to post warning signs. *See* Opposition at 7-8. As Moark argues, *see id*. at 7, disputes of this kind go to the weight, rather than the admissibility, of expert testimony, *see, e.g., Zuckerman v. Coastal Camps, Inc*., 716 F. Supp.2d 23, 28 (D. Me. 2010) ("When the adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion. If the factual underpinnings of the expert's opinions are in fact weak, that is a matter affecting the weight and credibility of [the expert's] testimony.") (citations and internal punctuation omitted). C&M has not shown that Mailhot's anticipated testimony is "so fundamentally unsupported" that it should be excluded altogether. *Id.* ("It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury that such testimony must be excluded on foundational grounds.") (citation and internal punctuation omitted).

### III. Conclusion

For the foregoing reasons, the plaintiff's motion to exclude the defendant's liability expert is **DENIED**. The plaintiff, of course, may object at trial on other grounds to any specific testimony of the expert.

6

Dated this 13th day of June, 2017.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge